## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**In re: CCA Recordings 2255 Litigation**,
          **Petitioners,**

**v.**
                                **Case No. 19-cv-2491-JAR**

                                **(This Document Relates to Case No. 16-cr-20022-JAR-2,** *United States v. Gary Jordan*, **and Case No. 19-cv-2015-JAR,** *Gary Jordan v. United States*)

**United States of America.**
          **Respondent.**

## MEMORANDUM AND ORDER

Petitioner Gary Jordan filed a Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 159).[1] Petitioner claims that the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications, and asks the Court to reject the government's request to dismiss this action on procedural grounds and find that he has made a sufficient showing to warrant an evidentiary hearing. As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or, alternatively, to reduce his custodial sentence by approximately 50% and vacate his term of supervised release. This matter is before the Court on Petitioner's Motion for Leave to Amend his § 2255 motion.[2] The matter is fully briefed, and the Court is prepared to rule. For the reasons explained below, the Court

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 16-20022-JAR-2. Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated Master case, No. 19-cv-2491-JAR-JPO. With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] *CCA Rec. Lit.*, Doc. 907.

grants Petitioner leave to amend, and denies his § 2255 motion, as amended, without an

evidentiary hearing.  Petitioner is also denied a certificate of appealability.

## I.      Background

### A.      Procedural History

Petitioner was charged in a Superseding Indictment with bank robbery (Count 1);

discharging a firearm during and in relation to a crime of violence (Count 2); and being a felon in

possession of a firearm (Count 3), stemming from the robbery of the First National Bank, located

in Stilwell, Kansas.[3]  Count 1 was punishable by up to 25 years' imprisonment, Count 2 carried a

mandatory, consecutive sentence of at least ten years and up to life imprisonment, and Count 3

carried a mandatory, consecutive sentence of up to ten years.[4]

On July 20, 2016, Petitioner pled guilty to all counts with no plea agreement.[5]  At the

plea hearing, the government summarized the factual basis for Petitioner's plea to all counts as

follows:

> On March 9th, 2016, the First National Bank located in
> Stilwell, Kansas, was robbed by two males later identified as the
> defendant, Gary L. Jordan, and Jacob R. Smith.  The two suspects
> were armed with handguns and entered the bank, confronted the
> tellers with the handguns, and took cash from the tellers, and fled
> the bank in a white 2003 Tahoe.
>
> Law enforcement located the vehicle a short time after the
> bank robbery and initiated a vehicle pursuit.  During the pursuit,
> the suspects fired shots at law enforcement from inside of the
> suspect vehicle.  The suspects were apprehended following a
> vehicle accident in Kansas City, Missouri.
>
> Video footage and witness interviews from the bank
> established that Jacob Smith and Gary Jordan entered the bank
> each carrying firearms.  Jordan approached the teller and,

---

[3] Doc. 26.

[4] *Id.* at 4; *see also* 18 U.S.C. §§ 924(a), (c), 2113(a), (d).

[5] Doc. 45.

displaying the firearm, demanded cash from the teller, who complied.  Both men then ran out of the bank and left in the Tahoe driven by Defendant Jordan.

Approximately five minutes after the robbery, the Kansas Highway Patrol located the suspect vehicle traveling north on Highway 69.  Highway patrol troopers attempted to stop the vehicle in the area of Highway 69 and 151st Street in Overland Park.  The suspect vehicle failed to stop for law enforcement and a pursuit ensued.

The Kansas Highway Patrol pursued the suspect vehicle into Leawood, Kansas, at which time Leawood police officers joined the pursuit.  Leawood Officer Jack Bond was positioned in the area of Mission and 124th Street.  Officer Bond deployed a tire deflation device in the roadway.  However, the suspect vehicle, which was traveling at a high rate of speed, drove around the device.  Simultaneous to evading the strips, Smith fired approximately six shots from the passenger's side of the Tahoe at Officer Bond.

Leawood officers Rues and Halsey were in the area of 119th Street and Mission.  As the suspect vehicle passed their patrol vehicle, Smith fired shots at their marked patrol car.  One of the fired shots struck their patrol car in the front driver's side quarter panel.

Detective Freeman joined the pursuit and attempted to stop the suspect vehicle.  As the suspect vehicle approached the Camelot Court Shopping Center at 119th Street and Roe Avenue, Freeman observed a white male subject, later identified as Smith, stick his arm out the window and point a gun towards the Camelot Center Shopping Center.  Freeman said the suspect then fired shots . . . from the handgun toward the shopping center.  Freeman observed the suspect attempt to point the handgun back towards his vehicle.

Law enforcement continued to pursue the suspect vehicle into Missouri, where it crashed attempting to exit onto Highway 71 from I-435.  The vehicle rolled off the highway were it became disabled on the side of the road.  Defendant Jordan ran from police officers and approached a woman who was driving her car on the highway.  Jordan attempted to carjack the woman but was apprehended by law enforcement officers.

> Law enforcement officers located [co-defendant] Danille Morris, who was seated in the front passenger's seat at the time the vehicle crashed.  Officers also located a 19-month-old child belonging to Danille Morris in a car seat which was fastened in the back seat directly behind the driver's seat.
>
> During the pursuit, Smith shot at law enforcement officers using the gun that he used during the robbery.  And when he ran out of bullets, Defendant Jordan gave him his gun, which Smith used.[6]

Without offering any specifics, his defense attorney, Jackie Rokusek informed the Court that Petitioner agreed that the government would have sufficient evidence to present to a jury to prove that he was guilty of all counts, but that he did not agree that all of the facts as stated by the government were correct.[7]  When asked by the Court, Petitioner agreed that the government had the evidence to prove all of the charges against him and that he, in fact, did what he was charged with in Counts 1, 2, and 3.[8]

Based on a total offense level of 31 and a criminal history category of IV, the Presentence Investigation Report ("PSIR") calculated Petitioner's applicable Guidelines range on Count 1 and 3 at 151 to 188 months' imprisonment; Count 2 carried a mandatory consecutive sentence of 120 months' imprisonment.[9]  The PSIR also presented information for the Court to consider in determining whether an upward departure from the applicable Guidelines sentence was appropriate in this case under U.S.S.G. § 3C1.2, including: (1) conduct that was reckless and includes a higher level of culpability, based on Petitioner leading officers on an extended high-speed pursuit in which he drove through multiple red lights at speeds in excess of 100 mph

---

[6] Plea Hrg. Tr., Doc. 118 at 17–20.

[7] *Id.* at 20.

[8] *Id.* at 20–21.

[9] Doc. 70 ¶ 95.

through congested traffic areas, with a co-defendant firing upon multiple pursuing law

enforcement officers, and with a 19-month old baby in the back seat; and (2) conduct that posed

a substantial risk of death or bodily injury to more than one person.[10]  The PSIR also presented

information for the Court to consider in determining whether a six-level departure under

§ 3A1.2(c)(1), or a variance under the factors set forth at 18 U.S.C. § 3553, was justified to

account for at least three law enforcement officers being assaulted during the flight from the

offense; and Petitioner's egregious conduct in fleeing from the officers in excess of 100 mph,

through congested traffic while directing his co-defendant to fire upon pursuing officers while an

infant child was in the back seat.[11]

 At sentencing on December 21, 2016, the Court determined the applicable Guidelines

range was 151 to 188 months' imprisonment on Counts 1 and 3, and 120 months on Count 2, to

run consecutively.[12]  Petitioner filed a sentencing memorandum requesting a total sentence of

270 months (22.5 years), citing his methamphetamine addiction, as well as a dysfunctional

childhood riddled with abuse and neglect and a learning disability.[13]  The government filed a

sentencing memorandum seeking an upward departure and variance from the advisory

Guidelines range to 420 months (35 years), on grounds that Petitioner intentionally created a

substantial risk of death or serious bodily injury to more than one person during the flight from

the bank robbery, including law enforcement officers and his co-defendant's 19-month old baby,

who was in the back seat of the getaway vehicle.[14]

---

[10] *Id.* ¶¶ 109–11.

[11] *Id.* ¶¶ 112–14.

[12] Doc. 75.

[13] Doc. 64.

[14] Doc. 67.

After considering both the aggravating and mitigating factors, this Court departed upward from the Guidelines range, and sentenced Petitioner to 240 months' imprisonment on Counts 1 and 3 and a consecutive 120-month term on Count 2, for a controlling sentence of 360 months, followed by three years of supervised release.[15]  The Court invoked Guidelines application notes addressing the extent of the danger Petitioner's conduct posed and his degree of culpability, as well as the § 3553 factors, describing Petitioner's conduct as follows: "[Jordan] started this whole deal by running into [a] bank with guns drawn and pointing them at people's heads and faces and demanding money."[16]  The Court continued:

> After robbing the bank at gunpoint, [Jordan] led officers on an extended high-speed pursuit, reaching speeds in excess of 100 miles per hour through congested traffic areas with [his co-defendant] firing multiple rounds at officers during the pursuit. One round, in fact, struck a police officer car on the driver's side, not far in front of where the officer driving the car was seated.[17]
>
> . . . .
>
> Ultimately, [Jordan] crashed the vehicle into a guardrail, causing a significant rollover accident.  But Mr. Jordan did not give in at that point, he fled on foot to a nearby vehicle, which he attempted to car-jack from the driver who was seated in the driver's seat of the vehicle.  Fortunately, law enforcement officers were able to apprehend him before he was able to drive away in that vehicle.[18]

The Court emphasized that this conduct occurred with his co-defendant's 19-month old baby in the back seat of the getaway vehicle, and that it was a miracle she was not injured during the car chase or the rollover crash.[19]  The Court also addressed Petitioner's personal characteristics,

---

[15] Doc. 33.  The underlying criminal proceedings were reassigned to Judge Daniel D. Crabtree after Judge Murguia resigned from the bench.  Doc. 72.

[16] Sent. Hrg. Tr., Doc. 92 at 104.

[17] *Id.* at 87–88, 95.

[18] *Id.* at 95–96.

[19] *Id.* at 88–89.

noting an abusive childhood and a need for counseling and substance-abuse treatment, which

would weigh against an upward variance.[20]

Petitioner appealed, and the Tenth Circuit affirmed his sentence.[21]  The mandate issued

on November 6, 2017.  Petitioner has not filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented in the underlying proceedings by Rokusek.  The Court

appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings

on July 17, 2018.[22]  On January 11, 2019, the FPD filed this § 2255 motion on Petitioner's

behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by

intentionally and unjustifiably intruding into his attorney-client communications.  Petitioner's

release date is October 1, 2041.

### B.      The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black*

Order") that precipitates the § 2255 motion before the Court.  That comprehensive opinion was

intended to provide a record for future consideration of the many anticipated motions filed

pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the

underlying facts and conclusions of law in detail but will provide excerpts from the record as

needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation,

which included audio recordings of telephone conversations and soundless video recordings of

meetings between attorneys and their clients who were detained at CCA.  On August 13, 2019,

the Court issued the *Black* Order, which addressed, *inter alia*, the governing standard for an

---

[20] *Id.* at 93–95.

[21] *United States v. Jordan*, 711 F. App'x 475 (10th Cir. 2017).

[22] Standing Order 18-3.

intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[23]  The Order discussed the

elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's

decision in *Shillinger v. Haworth*,[24] which held that a per se Sixth Amendment violation occurs

when: (1) there is a protected attorney-client communication; (2) the government purposefully

intruded into the attorney-client relationship; (3) the government becomes "privy to" the

attorney-client communication because of its intrusion; and (4) the intrusion was not justified by

any legitimate law enforcement interest.[25]  Once those elements are established, prejudice is

presumed.[26]

The Court further held that a finding of purposeful intrusion into the attorney-client

relationship necessarily requires a threshold showing that the recordings were protected attorney-

client communications.[27]  While recognizing that the attorney-client privilege is not a right

guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a

framework for this showing that the recordings between petitioners and counsel were protected

communications under the Sixth Amendment.  With respect to the video recordings, the Court

determined that the following threshold showings must be made after review and verification by

the FPD: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal

communication in the video is sufficient to confirm communication between the detainee and

counsel.[28]  This threshold showing also requires an affidavit from defense counsel confirming

---

[23] *Black* Order at 145–62.

[24] 70 F.3d 1132 (10th Cir. 1995).

[25] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[26] *Id.*

[27] *Id.* at 163.

[28] *Id.*

that the nature and purpose of the meeting(s) were within the ambit of protected communication.[29]

### C.  Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[30]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.  Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Relevant here, the government argued in response to many of petitioners' motions that the assertion of a per se Sixth Amendment violation under *Shillinger* was foreclosed by *Tollett v. Henderson*.[31]  In that case, the Supreme Court held that petitioners are barred from raising "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[32]  After the Court ordered supplemental briefing on the issue, multiple petitioners argued that *Tollett* did not apply to their claims, that *Shillinger*'s presumption of prejudice satisfied *Tollett*, and that it did not matter whether the alleged Sixth Amendment

---

[29] *Id.*

[30] *CCA Rec. Lit.*, Doc. 1.

[31] 411 U.S. 258 (1973).

[32] *Id.* at 267; *see CCA Rec. Lit.*, Doc. 588 at 55–56.

violation occurred before or after a petitioner's guilty plea for purposes of the *Shillinger* analysis.[33]

On January 18, 2021, the Court rejected petitioners' arguments, concluding that the rule in *Tollett* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[34]  The Court held that each petitioner who claims a pre-plea Sixth Amendment violation is held to the applicable standard for showing his plea was involuntary, and gave petitioners time to consider whether to seek leave to amend their motions to withdraw their pleas.[35]

Petitioners filed a motion to reconsider the Court's order, arguing, *inter alia*, that the Court should presume a Sixth Amendment violation occurred *both* pre- and post-plea, starting May 17, 2016.[36]  The Court rejected petitioners' argument, observing that "until their motion to clarify and reconsider, petitioners collectively took the same approach to their individual Sixth Amendment claims that did not address the timing issues that the government argues alter or end the course of certain categories of claims."[37]  The Court further rejected petitioners' attempts to "recast their continuing-violation theory as advancing 'dual allegations,'" describing it as "an attempted end-run around *Tollett* and its progeny and inconsistent with that rule and the authority cited by the Court."[38]

---

[33] *CCA Rec. Lit.*, Doc. 729 at 2–7, 12–19.

[34] *Id.*, Doc. 730 at 39.

[35] *Id.* at 40–41; *see Hill v. Lockhart*, 474 U.S. 52, 58–60 (1985) (adopting two-part test for ineffective assistance of counsel claim in the plea context: "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

[36] *Id.*, Doc. 756.

[37] *Id.*, Doc. 784 at 2.

[38] *Id.* at 11.

In order to "set petitioners on their way," however, the Court clarified that "[a]ny petitioner who has a good-faith basis to allege an individualized and specific post-plea violation must seek leave to amend his § 2255 motion."[39]  The Court stressed, however, that by giving petitioners additional time to seek leave to amend their motions, it neither predicted nor guaranteed the outcome of any such individual petitioner's request.[40]  Six petitioners, including Mr. Jordan, moved for leave to amend their motions to assert that they have a good-faith basis to claim a post-plea, pre-sentence Sixth Amendment violation.

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[41]  Instead, Petitioners in this temporal category must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[42]

### D.    Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black* investigation.[43]  The FPD reviewed one video recording of Petitioner meeting with Rokusek at CCA on March 22, 2016.[44]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, and verifying that during these meetings, Petitioner discussed matters

---

[39] *Id.*

[40] *Id.* at 19.

[41] *Id.*, Doc. 1034.

[42] *Id.*; *see Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[43] *Black* Order at 165.  The FPD took possession of the DVR hard drives on August 16, 2019. *Black*, Doc. 761.

[44] *CCA Rec. Lit.*, Doc. 205-2 at 88.

"relat[ing] to legal advice or strategy" with Rokusek.[45]  Petitioner also provided a sworn

declaration from Rokusek, stating that any conversation with an incarcerated client was related to

legal advice or strategy sought by Petitioner.[46]  Counsel attested that she did not believe such

recordings would be dispensed to prosecutors, nor did she consent to such distribution or

availability because she believed attorney-client calls were treated as confidential.

Petitioner was prosecuted by AUSAs Chris Oakley, Tris Hunt, and Sheri Catania, who

submitted  affidavits stating that they were not aware of the video recording nor did they view

the recording.[47]

After the government objected to Petitioner's privilege log, the Court reviewed the

recording *in camera*.  As set out in the privilege log, the video recording shows Petitioner

meeting with Rokusek on March 22, 2016, for approximately 30 minutes, where they reviewed

the Sentencing Guidelines Manual and documents.  In light of the analysis below, however,

further details of the meeting visible in the videos are not pertinent and will not be discussed in

this order.

## II.      Discussion

### A.      Motion for Leave to Amend

Petitioner's original § 2255 motion generally alleged that a Sixth Amendment violation

occurred when the government intentionally obtained soundless video recordings.  Although his

motion challenged his conviction, it did not specify when any alleged Sixth Amendment

violation might have occurred.  The Court subsequently clarified that the date the government

first obtained the recordings was May 17, 2016—before Petitioner plead guilty on May 31,

---

[45] *Id.*

[46] *Jordan v. United States*, 19-2015-JAR, Doc. 4-1.

[47] *Id.*, Docs. 3-1, 3-2, 3-3.

2016—and that it had possession of and access to the recordings until it disgorged the videos to the Court on August 9, 2016.[48]  In the wake of the Court's ruling that pre-plea claims are foreclosed under *Tollett*, Petitioner seeks leave to amend his claim to allege a more specific post-plea violation challenging only his sentence or term of supervised release.

Fed. R. Civ. P. 15(a)(2) governs a motion to amend a § 2255 motion if it is made before the one-year limitations period for filing a § 2255 petition has expired.[49]  Under Rule 15(a)(2), "a movant may file an amended § 2255 motion at any time during post-conviction proceedings with leave of court."[50]  An amendment only relates back to the original pleading, however, when "the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[51]  Without a claim relating back, a motion under § 2255 must be brought within a year from "the date on which the judgment of conviction becomes final."[52]

For untimely § 2255 amendments made outside of the one-year window, a claim will only relate back if, "by way of additional facts, [the amendment] clarifies or amplifies a claim or theory in the original motion."[53]  However, if the "proposed amendment . . . seek[s] to add a new claim or to insert a new theory into the case," it does not relate back to the original motion.[54] "[T]he operative question for" relation-back "is whether 'the original and amended [motions]

---

[48] *CCA Rec. Lit.*, Docs. 756 at 6, 784 at 13.

[49] *United States v. Ohiri*, 133 F. App'x 555, 559 (10th Cir. 2005).

[50] *United States v. Roe*, 913 F.3d 1285, 1296 (10th Cir. 2019) (citing Fed. R. Civ. P. 15(a)(2)).

[51] Fed. R. Civ. P. 15(c)(1)(B).

[52] 28 U.S.C. § 2255(f)(1).

[53] *Roe*, 913 F.3d at 1296 (quoting *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)).

[54] *Id.*

state claims that are tied to a common core of operative facts.'"[55]  "The answer to that question

will often turn on whether the newly asserted claim would have had to be pleaded as a discrete

claim under Section 2255 Rule 2(b) if it was set out in the original § 2255 motion."[56]

Here, Petitioner's motion for leave to amend was filed outside the one-year window.

Thus, to relate back to his original § 2255 motion, the amendment must not "add a new claim or

. . . insert a new theory into the case."[57]  The Court finds that it does not.  Petitioner's original

§ 2255 motion alleged the prosecution team became privy to his protected recordings at some

point during the course of his prosecution, specifically between May 16 and August 10, 2016.

His proposed amendment states that he is now electing to allege this event occurred between July

21, 2016 and August 9, 2016, allegations that are similar in both time and type.  Thus, because

the proposed amendment serves to narrow the more generalized assertions he previously made, it

relates back to his original § 2255 motion.  Accordingly, the Court grants Petitioner's motion for

leave and will proceed to analyze his claim as asserting a post-plea, pre-sentence Sixth

Amendment violation.[58]

---

[55] *Id.* at 1298 (alteration in original) (quoting *United States v. Trent*, 884 F.3d 985, 992–93 (10th Cir. 2018)).

[56] *Id.*

[57] *Id.* at 1296 (quoting *Espinoza-Saenz*, 235 F.3d at 505).

[58] In *United States v. Spaeth*, the Tenth Circuit recently affirmed the Court's decision regarding preclusion of pre-plea Sixth Amendment claims, ruling: (1) the carve-out provision in the petitioner's unconditional standard plea agreement did not constitute a waiver of the government's right to raise, or create an exception to, the rule of law in *Tollett*, and because petitioner had not met his burden under *Tollett* to vacate his unconditional guilty plea, this Court did not err in ruling that *Tollett* bars his Sixth Amendment challenge; (2) the petitioner's reliance on the per se Sixth Amendment violation rule in *Shillinger* is misplaced because that case did not concern *Tollett*'s guilty-plea situation and has nothing to do with whether a guilty plea is voluntary or knowing; and (3) *Tollett* precludes the petitioner from challenging his sentence based on an alleged pre-plea Sixth Amendment violation.  *See* 69 F.4th 1190, 1204–13 (10th Cir. 2023).  Because Petitioner relied on the per se prejudice rule in *Shillinger* and did not attempt to meet the applicable *Tollett* standard for showing that ineffective assistance of counsel caused him to enter his plea involuntarily and unknowingly, the decision in *Spaeth* would compel dismissal of his original pre-plea claim challenging his conviction as well as any challenge to his sentence based on that pre-plea violation.

### B.        *Orduno-Ramirez*

As noted, the Court's December 10, 2021 Order concluded that petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea but before sentencing could not rely on *Shillinger*'s per se rule.[59]  Instead, the Court held that Petitioners in this temporal category must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[60]

The Tenth Circuit Court of Appeals affirmed this Court's decision in another § 2255 proceeding raising a similar Sixth Amendment violation claim involving video recordings.  In *United States v. Orduno-Ramirez*, the Tenth Circuit declined to categorically extend a conclusive presumption of prejudice to post-plea or -conviction intrusions into attorney-client communications.[61]  After noting this Court held that the petitioner must show prejudice in such cases, the Tenth Circuit did "not decide which party bears the burden because the Government has shown that Mr. Orduno-Ramirez has not been prejudiced, and he does not contend otherwise."[62]  The court found that the government showed that the intrusion did not cause Mr. Orduno-Ramirez prejudice, and Orduno-Ramirez did not contend that he was prejudiced, relying instead on the presumption of prejudice in *Shillinger*.[63]  The court further found that the government showed that the lead prosecutor did not view the videos, the soundless video

---

[59] *CCA Rec. Lit.*, Doc. 1034.

[60] *Id.*; *see Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[61] 61 F.4th 1263, 1273–77 (10th Cir.) (discussing *Shillinger*, 70 F.3d at 1142), *cert. denied*, ---S. Ct.---, 2023 WL 7287223 (Nov. 6, 2023).

[62] *Id.* at 1276.

[63] *Id.* at 1277.

recordings provided no strategic value to the prosecution, and the record reveals no irregularity in the petitioner's sentencing proceedings.[64]

The Tenth Circuit also denied Orduno-Ramirez's request to order supplemental briefing on the burden-of-proof question.[65]  In a separate related case on appeal, however, the court recently agreed to address the issue of "[w]hether the district court erroneously required [Petitioner] to demonstrate prejudice to establish his Sixth Amendment claim."[66]

Although the question of whether the petitioner must show prejudice or whether the government must show lack of prejudice is an open question, the Court easily finds that Petitioner has not been prejudiced in this case.  While the December 10, 2021 Order held that Petitioner bears the burden to show prejudice resulting from the intentional intrusion into his attorney-client communications, the government introduced evidence and arguments showing that he suffered no prejudice.  As was the case in *Orduno-Ramirez*, the government submitted an affidavit from the lead prosecutors stating that at no time during their involvement in the case did they view any video recordings of Petitioner meeting with counsel at CCA.

Further, although the parties had a contested hearing, Petitioner's sentencing bears no indicia of a tainted proceeding.  Like Orduno-Ramirez, Petitioner pled guilty without a plea agreement.  The government unsuccessfully advocated for a sentence of 420 months' imprisonment based on the extreme circumstances of the bank robbery offense.  After considering the aggravating and mitigating circumstances, the Court agreed in part that an upward variance to 360 months was justified, based on the egregious nature of the offense, which was supported by extensive evidence from the case investigation included in the PSIR.

---

[64] *Id.*

[65] *Id.* at 1277 n.24.

[66] *United States v. Valdez*, No. 22-3025 (10th Cir. Sept. 12, 2023).

The government did not cross-appeal the Court's findings or sentencing calculation.  Thus, the prosecution bore all the hallmarks of a reasoned advocate for the government and not an antagonist leveraging inside information.

The Court agrees that none of the information the Court, the United States Probation Office, or the government relied on for sentencing could have come from the March 22, 2016 soundless video recording.  Even assuming the government bears the burden of proving lack of prejudice, it has met that burden because the record reveals no irregularity in or threat to the reliability or fairness of Petitioner's sentencing proceedings, where he received a sentence commensurate with the nature and circumstances of the offense.  Because he pled guilty without a plea agreement, Petitioner was able to directly appeal his sentence, which was affirmed by the Tenth Circuit.  Because the government has shown the intrusion did not cause prejudice—and Petitioner does not contend that he was actually prejudiced—there is no Sixth Amendment violation and no ground for relief under § 2255.[67]

## III.     Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[68]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[69]  For the reasons stated above, the Court finds that

---

[67] *Orduno-Ramirez*, 61 F.4th at 1266.

[68] 28 U.S.C. § 2253(c)(2).

[69] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).

Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Gary Jordan's Motion for Leave to Amend (Doc. 907 in Case No. 19-2491) is **granted**;

**IT IS FURTHER ORDERED** that Petitioner's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255, as amended (Doc. 159), is **denied without an evidentiary hearing**.  Petitioner is also denied a certificate of appealability.

**IT IS FURTHER ORDERED** that Petitioner's pro se Motion for Release from Custody pending the outcome of his § 2255 motion (Doc. 203) and Motion for Request of Status of Filings (Doc. 205) are **denied as moot**.

**IT IS SO ORDERED.**

Dated: <u>November 14, 2023</u>

<u>S/ Julie A. Robinson</u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE